**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARK SINGHOFFER, Derivatively on Behalf of LONGFIN CORP., | Civil Action No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| VENKAT S. MEENAVALLI, VIVEK KUMAR RATAKONDA, YOGESH PATEL, LINGA MURTHY GADDI, GHANSHYAM DASS, DAVID NICHOLS, and JOHN PARKER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| LONGFIN CORP., | |
| Nominal Defendant. | |

Plaintiff Mark Singhoffer ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Longfin Corp. ("Longfin" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Longfin with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Longfin against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, unjust enrichment, abuse of control, and waste of corporate assets that occurred between December 15, 2017 to the present (the "Relevant Period") and have caused substantial harm to Longfin.

## JURISDITION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3.      Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and because Defendants conducted business here and engaged in numerous activities that had an effect in this District.

## PARTIES

**A.**      **Plaintiff**

4.      ***Plaintiff Mark Singhoffer*** ("Singhoffer") is, and was at relevant times, a shareholder of Longfin.  Plaintiff Singhoffer will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Michigan.

**B.**      **Nominal Defendant**

5.      Nominal Defendant Longfin is incorporated in Delaware and maintains its principal executive offices at 16-017, 85 Broad Street, New York, New York 10004.  Longfin is a citizen of New York.

**C.**     **Director Defendants**

6.        *Defendant Venkat S. Meenavalli* ("Meenavalli") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times.  Upon information and belief, Meenavalli is a citizen of New Jersey.

7.        *Defendant Vivek Kumar Ratakonda* ("Ratakonda") has served as the Company's Chief Financial Officer ("CFO") and a director at all relevant times.  Upon information and belief, Ratakonda is a citizen of New York.

8.        *Defendant Yogesh Patel* ("Patel") is a member of the Board.  Patel is also the Company's Global Head Officer and Secretary.  Upon information and belief, Patel is a citizen of New Jersey.

9.        *Defendant Linga Murthy Gaddi* ("Gaddi") is a member of the Board and the Company's Chief Technical Officer.  Upon information and belief, Gaddi is a citizen of New York.

10.       *Defendant Ghanshyam Dass* ("Dass") is a member of the Board.   Upon information and belief, Dass is a citizen of California.

11.       *Defendant David Nichols* ("Nichols") is a member of the Board.  Upon information and belief, Nichols is a citizen of New York.

12.       *Defendant John Parker* ("Parker") is a member of the Board.   Upon information and belief, Parker is a citizen of New York.

**Non-Party**

13.       *Non-Party Avinash Karingam* ("Karingam") is a member of the Board.  The Board subsequently appointed Karingam, as a member of the Board, which appointment occurred on July 27, 2018, immediately following Henry Wang's resignation.  Karingam also serves as chairman of Compensation Committee and member of the Audit committee and Nominating and

Governance Committee in place of Henry Wang.

14.     Defendants Meenavalli, Ratakonda, Patel, Dass, Gaddi, Nichols, and Parker are hereinafter referred to as the "Director Defendants.".

## DUTIES OF DEFENDANTS

15.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Longfin, Defendants owe Longfin and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage Longfin in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Longfin and its investors.

16.     Each director of the Company owes to Longfin and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

17.     To discharge their duties, the officers and directors of Longfin were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Longfin were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Longfin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

18.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due

care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Longfin, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

19.     Longfin is a finance and technology company that purports to specialize in structured trade finance and physical commodities finance solutions.  The Company also claims to provide blockchain technology solutions for a variety of businesses.

## MATERIAL MISSTATEMENTS
## AND OMISSIONS DURING THE RELEVANT PERIOD

20.     On December 11, 2017, prior to the listing of the Company's Class A Stock on NASDAQ, the Company's directors accepted the resignation of its former CFO and COO and appointed Ratakonda as CFO.  In addition, the members of the Board, including Defendant Ratakonda, approved the Company's acquisition of Ziddu.com from Meridian Enterprises for 2.5 million Longfin Class A Shares.  Upon information and belief, Defendant Meenavalli owned approximately 92% of Meridian Enterprises at the time of this transaction.[1]

21.     On December 13, 2017, the Company's Class A Stock opened at a price of $6.94

---

[1]     On July 27, 2018, Defendant Meenavalli filed a Form 4 with the SEC reporting: (a) he had a 97.58% ownership interest in Meridian Enterprises when the Ziddu.com acquisition occurred; (b) following the Ziddu.com acquisition, through his ownership in Meridian Enterprises, he had a pecuniary interest in 2,097,970 Class A Shares; and (c) that on July 23, 2018 and July 25, 2018, he sold approximately 92.67% of that interest (carrying a pecuniary interest in 965,515 Class A Shares) in exchange for $5,900,608.  This is was the first Form 4 ever filed on the SEC's Edgar Database.

per share and closed at $5.17 per share. That same day, the Company issued a press release stating

in relevant part:

> New York, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (NASDAQ: LFIN), a leading global FinTech company, announces that it will be traded on the Nasdaq market for the first day after its initial public offering (IPO) under Reg A+ closing on December 8, 2017.
>
> "We are delighted to be the first FinTech company went public through Reg A+ on the Nasdaq market," commented Mr. Meenavalli, Chairman and CEO of Longfin.
>
> "We acknowledged the Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, like us, with great opportunities to raise capital from the market.  We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."
>
> *     *     *
>
> About Longfin Corp.
>
> Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

22.     On December 13, 2017, the Company issued another press release that stated in

relevant part:

> NEW YORK, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp. (Nasdaq: LFIN), a leading global FinTech company powered by Artificial Intelligence (AI) and Machine Learning, visited the Nasdaq MarketSite in Times Square today in celebration of its initial public offering (IPO) on The Nasdaq Stock Market.
>
> According to a research report of Asian Development Bank (ADB), in 2016, the global trade finance gap is $1.5 trillion.  Access to finance is the biggest challenge to small and medium enterprises in developing countries and other frontier markets. Powered by Artificial Intelligence (AI) and Machine Learning, Longfin delivers foreign exchange and finance solutions to importers/exporters and SMEs. Its presence in the world's leading markets enables them to offer clients access to nuances of the local markets while providing gateway to the global markets.
>
> "We are delighted to be the first FinTech company went public through Reg A+ on Nasdaq," commented Mr. Meenavalli, Chairman and CEO of Longfin. "We

acknowledged Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, such as ourselves, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the shareholder value."

"India's innovation-driven growth has been unprecedented.  Its economy boosts transformation within the country and contributes to global development." said Bob McCooey, Senior Vice President, Nasdaq.  "As the 2nd IPO completed on Nasdaq by an Indian company since 2010, Longfin embodies the can-do spirit like many entrepreneurs of Nasdaq listed companies.  We are excited to partner with them as they continue to grow."

About Longfin Corp.

Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

23.     The December 13, 2017 press releases were false and misleading because they concealed and omitted the material fact that the Company had obtained its NASDAQ listing under false and fraudulent pretenses, and the Company's Class A Stock was actually ineligible for listing on NASDAQ.  Specifically, the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a).  The December 13, 2017 press releases were also false and misleading because they omitted and concealed the material facts that: (a) the Company's entire Regulation A Offering was a sham and all publicly held or traded shares of Class A Stock were issued in non-exempt transactions involving unregistered securities and had been sold to the public improperly and without properly observing the requirements of Regulation A—such as Regulation A's requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; and (c) Longfin was not "a US based, global fintech

company powered by artificial intelligence (AI) and machine learning."

24.     Moreover, the December 13, 2017 press releases were false and misleading because the Company had not actually operated out of the United States – let alone New York, as indicated. As reported by in *The Wall Street Journal*, on April 3, 2018, the so-called "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment.

25.     On December 15, 2017, the Company issued a press release entitled *Longfin Corp acquires Blockchain empowered Global Micro-lending solutions provider Ziddu.com*.  The press release stated in relevant part:

> New York, NY (December 14, 2017) - Longfin Corp. (LFIN: Nasdaq) announces the acquisition of Ziddu.com, a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents.
>
> Ziddu Warehouse Coin is a smart contract that enables Importers and Exporters to use their Ziddu coins that are loosely pegged to Ethereum and Bitcoin Crypto Currency. The Importers/Exporters convert offered Ziddu coins into Ethereum and Bitcoin Cryptocurrencies and use the proceeds for their working capital needs.
>
> *      *      *
>
> "The advent of Blockchain technology has caught the imagination of the global financial services industry; blockchain is emerging as a technological revolution that we believe is set to disrupt the financial services infrastructure. Crypto currencies such as Bitcoin and Ethereum are expected to act as a global financing currency to avail credit against hard currencies of many emerging markets." Says Venkat Meenavalli, Chairman of Longfin Corp.
>
> Ziddu intends to use blockchain technology to transform the lives of millions of SME's by providing finance by way of Ziddu coins and through Crypto Currencies such as Ethereum and Bitcoin against their collateralized warehouse receipts.  At the end of the contract, Importers/Exporters are expected to realize their proceeds and pay back their funds through Crypto Currencies only. Depending upon the risk profile of the counterparty, the interest will vary between 12% to 48%.

26.     The above press release contained false or misleading representations.   The Ziddu.com acquisition and its announcement were the byproduct of the scheme to artificially inflate the Class A Stock's trading price.   The Company misled shareholders into believing that it had acquired a valuable asset related to virtual currencies (referred to as cryptocurrencies) and that this asset had been operating as a provider of "Blockchain technology empowered solutions."

27.     The Ziddu.com Announcements were issued when trading prices for virtual currencies had reached record highs.   For example, the trading price of Bitcoin ("BTC") rose from approximately $900 per BTC in January 2017 to approximately $20,000 per BTC in December 2017, an increase of approximately 11,000%.

28.     The Ziddu.com Announcements misled shareholders with their description of the "Ziddu Warehouse Coin" (the "Ziddu Coin") which purportedly had a value "loosely pegged" to Bitcoin and Ethereum.   This representation misled shareholders into believing that the value of Ziddu.com had some correlation to the value of BTC and Ethereum, both of which experienced exponential growth in recent months.   In fact, the Ziddu Coin has never had any value – let alone a value pegged to BTC or Ethereum.

29.     As revealed in the Company's Form 10-K annual report filed on April 2, 2018 (the "2017 Form 10-K"), Ziddu.com had no revenue or value at the time of its acquisition.   In fact, the Company recorded Ziddu.com's value as $0 – a fact which would have been material to Company shareholders when the acquisition was announced.   However, such information was not revealed until the filing of the 2017 Form 10-K, which stated in relevant part:

> On December 11, 2017, the Company issued 2,500,000 shares of its Class A Common Stock in connection with the purchase of the website www.Ziddu.com and all of its respective content and intellectual property rights (the "Ziddu"), from Meridian Enterprises Pte. Ltd., ("Meridian") a company owned 92% by Mr. Meenavalli. ***The acquisition of the Ziddu has been accounted for as an asset acquisition between entities under common control and was recorded at***

*Meridian's historical carrying value of $0 (zero)*. The website and related content and intellectual property comprised substantially all of the value acquired. ***Meridian had not recognized revenue related to Ziddu historically***. [Emphasis added].

30.     The Company's representations relating to the Ziddu.com acquisition were false and misleading.

31.     In the days following issuance of the Ziddu.com Announcements, the Company's Class A Stock increased from $5.39 per share on December 14, 2017, to a high of $142.82 on December 18, 2017, representing an increase of more than 2,500% in just three (3) trading days, due to the Company's false or misleading statements and omissions.  Shortly thereafter, the Company's Class A Stock declined, eventually falling 96.46% to an opening price of $5.05 on May 24, 2018 – the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

32.     On January 23, 2018, the Company issued a press release entitled *Multibillion Dollar Fund to Invest $52.7 million into Longfin Corp*.  This Company press release stated in relevant part:

New York, Jan. 23, 2018 (GLOBE NEWSWIRE) -- Longfin Corp. ("Longfin" or the "Company") (NASDAQ: LFIN) a leading global FinTech company, has announced that the Company has entered into a securities purchase agreement with a multi-billion dollar fund. The institutional investor is investing $52,700,000 through convertible note instruments (the "Notes").  A press release regarding the transaction was previously issued prior to finalization of the documentation earlier today, and the Company is confirming the transaction is proceeding on the terms indicated below.  Joseph Gunnar & Co., LLC is acting as placement agent.

                    *        *        *

**Key Transaction Details**

The Notes consist of (i) Series A Senior Convertible Notes in the aggregate principal amount of $10,095,941.18 and (ii) Series B Senior Secured Convertible Notes in the aggregate principal amount of $42,604,058.82. The nature of the investment will involve (i) an upfront cash payment in the amount of $5,000,000,

and (ii) secured promissory notes payable by the investors to the Company in the aggregate principal amount of $42,604,058.82 (referred to below as the "Investor Notes").  Under the Investor Notes, the Investors are required to prepay the Investor Notes to the Company in two equal installments following the registration of all of the shares underlying the Investor Notes and warrants issued together with the Investor Notes.

Longfin is one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry worldwide.

"*To secure funding from this large institutional investor at current market valuation will enhance the visibility and revenue growth of the company in a rapid way.  We are confident in our goal of reaching a 250% revenue growth rate organically, and outnumbering our growth rate in 2017.  This funding will also help Longfin in its acquisition endeavors within the Blockchain powered Smart Contracts and FinTech space across the globe,*" stated Venkat S. Meenavalli, Chairman and CEO of Longfin Corp.

*      *      *

About Longfin Corp.

*Longfin Corp (Nasdaq: LFIN) is a US-based, global fintech company powered by artificial intelligence (AI) and machine learning*.  The Company, through its wholly-owned subsidiary, Longfin Tradex Pte. Ltd, delivers FX and alternative finance solutions to importers/exporters and SME's.  *Ziddu.com owned by the company is the only market place for smart contracts powered by Consensus Settlement Algorithm on ethereum blockchain. Ziddu ethereum ERC20 blockchain Token uses a technology stack in which Smart Contracts run in distributed virtual machines, which in turn run on a Consensus Settlement Algorithm (CSA) providing solutions to warehouse / international trade financing, micro-lending, FX OTC derivatives, bullion finance, and structured products. Currently the company has operations in Singapore, Dubai, New York and India.*  [Emphasis added].

33.    The above statements were false and misleading because, as revealed in the Amendment to the 2017 Form 10-K (the "2017 Form 10-K/A"), filed on April 19, 2018, it was unlikely that the Company "will be able to continue as a going concern unless a significant restructuring of [its] obligations is implemented, either by means of negotiation or through a bankruptcy proceeding."  And again, like the Ziddu.com Announcement, the January 23, 2018 press release referenced the fact that the Company's Class A Stock was traded on NASDAQ under

the ticker symbol LFIN.  However, like the Ziddu.com Announcements, the January 23, 2018 press release was misleading because it concealed and omitted the material fact that the Company had obtained its NASDAQ listing under false pretenses, and the Company's Class A Stock was actually ineligible for listing on NASDAQ.

34.     Also, the January 23, 2018 press release was also false and misleading because it omitted and concealed that: (a) the Company's Class A Stock was unregistered and had been sold to the public improperly and without properly observing the requirements of Regulation A—such as Regulation A's requirement that an issuer conducting an offering actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares into the marketplace for their own benefit rather than that of the Company; and (c) the Company was not "a US-based, global fintech company powered by artificial intelligence (AI) and machine learning."

35.     Moreover, the January 23, 2018 press release was false and misleading because it omitted and concealed material facts concerning the Company's business and operations, including the extent of the Company's capabilities at its New York offices and the identity and qualifications of key employees. For example, the Company had not actually operated out of the United States – let alone New York.  In fact, as reported by in *The Wall Street Journal*, on April 3, 2018, the Company's "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment:



36.     In short, the Company's representations regarding its business operations, headquarters in New York, and status as "one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry" were misleading.  In fact, as with the Ziddu.com Announcements, the Company's solicitations have consisted of buzz words designed to distract and mislead shareholders into believing that it was actually a financial technology company involved in industries such as artificial intelligence or blockchain technology.

37.     On March 16, 2018, the Company was added to the Russell indices as part of Russell's quarterly addition of companies with recent initial public offerings.  This addition significantly increased shareholder demand for the Company securities.

38.     On March 22, 2018, the Company issued a press release entitled *Longfin Corp. Joins Russell 2000® Index and Russell 3000® Index*.  This Company press release stated in

relevant part:

> Longfin Corp. ("Longfin" or the "Company") (LFIN), a global FinTech company, has announced that it has been added to the Russell 2000® Index and the Russell 3000® Index, effective March 16, 2018, as part of Russell's quarterly additions of companies with recent initial public offerings.
>
> Russell indices are widely used by investment managers and institutional investors for both index funds and as benchmarks for passive and active investment strategies in the U.S. marketplace.  The Russell 3000® Index measures the performance of the largest 3,000 U.S. companies, representing approximately 98% of the investable U.S. equity market.
>
> The Russell 2000® Index measures performance of the small-cap segment of the U.S. equity market and is a subset of the Russell 3000® Index.
>
> Venkat S. Meenavalli, Chairman and CEO of Longfin, says "We are pleased that Longfin is included in the Russell 2000® Index. We believe that this inclusion reflects the stockholder value we are building and will help increase Longfin's visibility within the investment community."

39.     The above statements were false and misleading because the statements omitted adverse facts about the Company's business, operations, and compliance policies.  In short, Defendants' statements were false and misleading because: (a) the Company had material weaknesses in its operations and internal controls over financial reporting; (b) the Company's purported public float – which Russell relied upon in determining that the Company's Class A Stock would be listed in its indices – was severely inflated by the unregistered Class A Shares Defendants illegally introduced into the public market through non-exempt transactions and numerous shares held by Defendants' affiliates; and (c) the Company suffered financial losses which imperiled its ability to continue as a going concern.

40.     For example, contrary to Defendant Meenavalli's representations that the Company's "inclusion [in on the indices] reflects the stockholder value we are building," the Company was of little to no "value" to shareholders.  In fact, once the Company's financial statements had been audited, the Company's substantial financial losses were revealed and there

were "substantial doubts" that the Company would continue as a going concern:

> The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations.  These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going concern.  Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis. If the Company is unable to obtain the monies from the Financing, it would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations.  These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

41.     Moreover, these statements contained in the Russell Press Release were false because they omitted material facts that: (a) the Company's Class A Stock were unregistered and had been sold to the public improperly and without observing the requirements of Regulation A— such as Regulation A's requirement that an issuer conducting an offering thereunder actually be headquartered in the United States or Canada; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; (c) the Company's Class A Stock was not qualified for trading on NASDAQ nor for inclusion in any Russell index; and (d) neither Longfin nor Ziddu.com had any operations concerning, prior experience in, or involvement with blockchain technology.

## THE TRUTH EMERGES

42.     On March 26, 2018, *Citron* reported: "If you are fortunate enough to get a borrow, indeed $LFIN is a pure stock scheme. @sec_enforcement should not be far behind. Filings and press releases are riddled with inaccuracies and fraud."

43.     The same day, Russell issued a statement entitled *Longfin Corp (USA): Constituent*

*Deletion Changes in Russel Global Index Series*, stating in relevant part:

> Longfin (USA, constituent) was included as an IPO in the Russell 2000 index at the March quarterly update on the basis of its IPO filing of 3 November 2017 which stated that up to 10,000,000 Class A common shares would be offered. Subsequently, an SEC filing published on 13 February 2018, immediately prior to the Russell US Index rank date of 14 February 2018 for the quarterly IPO additions, confirmed that up to a maximum of 1,140,000 of the shares offered had been taken up by the public.  Consequently, FTSE Russell has determined that Longfin failed to meet the minimum 5% free float requirement as at the 14 February rank date. In accordance with the FTSE Russell Recalculation Policy and Guidelines, Longfin will therefore be removed from the Russell Indexes on 28 March 2018 (after the close).

44.     On this news, the Company's Class A Stock declined from $59.28 per share on March 26, 2018 to close at $34.68 per share on March 27, 2018.

45.     On March 27, 2018, *CNBC* published an article entitled *Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index*.  Defendant Meenavalli stated in relevant part:

> "We are reapplying" for inclusion in the indexes, Longfin CEO Venkat Meenavalli told CNBC in a phone interview Tuesday. He said the stock's free float has increased above the minimum 5 percent as of March 11 due to the expiration of a lockup period on a consultant's stock holdings. As for Citron's negative view, "we are going to take legal action after we file the 10-K" in the next three days, Meenavalli said. "The company is a profitable company, making revenue."

46.     On this news, the trading price of the Company's Class A Stock declined from $34.68 per share on March 27, 2018 to close at $17.26 per share on March 29, 2018, a decline of more than 50%.

47.     On April 2, 2018, the Company filed its 2017 Form 10-K, revealing that the Company: (a) had material weakness in its internal control over financial reporting; (b) was the subject of an SEC investigation concerning its initial public offering and acquisition of Ziddu; and (c) may not be able to continue as a going concern.  The 2017 Form 10-K stated in relevant part:

> **We have identified several material weaknesses in our internal control over**

17

*financial reporting*.  If our planned remediation of these material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control over financial reporting in the future, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the value of our securities.

In connection with the audit of our financial statements beginning on page F-1, the Company identified several material weaknesses in its internal control over financial reporting.   A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis.  Below are the material weaknesses identified:

- the Company lacks qualified personnel who fully understand GAAP reporting requirements, possess appropriate skills to identify and determine proper accounting for new, complex or unusual transactions or have a proficiency in the SEC reporting environment;

- the Company did not maintain sufficient personnel with the technical knowledge and skills to perform accounting functions for complex/nonrecurring transactions and financial reporting functions;

- the Company exhibited an overall lack of sufficient knowledge, organized and sufficient audit support, documented positions and assessments, and policies/procedures related to the accounting treatment for both complex and non-complex transactions;

- certain segregation of duties issues exist (i.e., the same person performs the process and the control in certain areas);

- the Company does not have any formal or documented accounting policies and procedures, including with respect to intangible assets and monitoring related parties;

- senior financial reporting personnel have the ability to make journal entries; and

- there is no formal review process around journal entries recorded. Neither we nor our independent registered public accounting firm has performed an evaluation of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. In light of the material weaknesses that were identified, we believe that it is possible that additional material weaknesses and control deficiencies may have been identified if such an evaluation had been performed.

The Company is working to remediate the material weaknesses, has taken steps to enhance the internal control environment, and plans to take additional steps to remediate the material weaknesses. Specifically, we will:

- seek technically competent staff with appropriate experience applying GAAP accounting guidance and are currently utilizing a consultant with US GAAP/SEC experience to assist with financial reporting requirements;

- design additional controls around identification, documentation and application of technical accounting guidance; implement additional internal reporting procedures, including those designed to add depth to the review processes and improve segregation of duties; and

- restructur[e] internal controls to eliminate or improve known control issues.

The actions that we are taking are subject to ongoing senior management review as well as audit committee oversight.  Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our efforts may not be successful in remediating these material weaknesses. In addition, we will incur additional costs in improving our internal control over financial reporting.  If we are unable to successfully remediate these material weaknesses or if we identify additional material weaknesses, we may not detect errors on a timely basis. This could harm our operating results, cause us to fail to meet our SEC reporting obligations or NASDAQ Capital Market listing requirements on a timely basis, adversely affect our reputation, cause our stock price to decline or result in inaccurate financial reporting or material misstatements in our annual or interim financial statements.

In addition to the remediation efforts related to the material weaknesses described above, we are in the process of designing and implementing the internal control over financial reporting required to comply with Section 404 of the Sarbanes Oxley Act. This process will be time consuming, costly and complicated.

If during the evaluation and testing process, we identify one or more other material weaknesses in our internal control over financial reporting, our management will be unable to assert that our internal control over financial reporting is effective. Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may conclude that there are material weaknesses with respect to our internal controls or the level at which our internal controls are documented, designed, implemented or reviewed. If we are unable to assert that our internal control over financial reporting is effective, or when required in the future, if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our

securities could be adversely affected, and we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, which could require additional financial and management resources.

*   *   *

**Going Concern**

The Company has limited operating history and experienced a net loss of $26.4 million since its inception.  The Company has $2.1 million of cash at December 31, 2017.  The Company operates primarily in structured trade finance and providing technology services and our operating costs are primarily related to the cost of providing those services, employee compensation and administrative expenses.

On January 22, 2018, pursuant to a Securities Purchase Agreement ("SPA") entered into by an institutional investor (the "Investor"), the Company agreed to sell and issue (1) (i) Senior Convertible Notes to the Investor in the aggregate principal amount of $52,700,000 (each, a "Note" and collectively, the "Notes"), consisting of a Series A Note in the principal amount of $10,095,941 and (ii) a Series B Note in the principal amount of $42,604,059, and (2) a warrant to purchase 751,894 shares of Longfin Class A Common Stock, exercisable for a period of five years at an exercise price of $38.55 per share (the "Warrant"), for consideration consisting of (i) a cash payment of $5,000,000, and (ii) a secured promissory note payable by the Investor to Longfin (the "Investor Note") in the principal amount of $42,604,059 (collectively, the "Financing"). On February 13, 2018, the Company completed the Financing and related funds sale and issuance of the Notes, the Warrant and a placement agent warrant. The maturity date of the Notes is August 13, 2019 and the Investor Note is February 13, 2048. To date, the Company has received $3.7 million in net proceeds ($5.0 million net of costs of $1.3 million) related to the Financing and will not be able to obtain additional monies through the Financing until the Company files a Registration Statement to register the common shares underlying the Notes and Warrant and such Registration Statement is declared effective by the Securities and Exchange Commission or such shares are eligible for resale pursuant to Rule 144 under the Securities Act, or the investor elects to convert or exercise such securities notwithstanding the underlying shares have not been so registered or are then so eligible.

***The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations***. These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going concern.  Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis.  If the Company is unable to obtain the monies from the Financing, it

20

would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations. These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

\*       \*       \*

**Legal Matters**

The Company is and may become subject to certain legal proceedings and claims arising in connection with the normal course of its business. In the opinion of management, there are currently no claims that would have a material adverse effect on its consolidated financial position, results of operations or cash flows. On March 5, 2018, the Division of Enforcement of the SEC informed the Company that it is conducting an investigation In the Matter of Trading in the Securities of Longfin Corp. and requested that the Company provide certain documents in connection with its investigation, including documents related to our IPO and other financings and the acquisition of Ziddu.com. The Company is in the process of responding to this document request and will cooperate with the SEC in connection with its investigation. While the SEC is trying to determine whether there have been any violations of the federal securities laws, the investigation does not mean that the SEC has concluded that anyone has violated the law. Also, the investigation does not mean that the SEC has a negative opinion of any person, entity or security. [Emphasis added].

48.    On April 2, 2018, *The Wall Street Journal* published an article entitled *Up- and-Down IPO Longfin Is Facing an SEC Probe*.  This article reported that the Company had "failed to disclose important information and left a trail of misstatements behind," that led to the SEC's investigation.  Further, the article revealed misrepresentations regarding the Company and its financial filings, including the identity of key employees, and the extent of operations at its downtown Manhattan principal offices.  The article stated in relevant part:

Longfin Corp. LFIN 3.82% took advantage of post-financial-crisis rules designed to create jobs and help young companies go public.  But the financial-technology company, which was valued at $5.4 billion as recently as 10 days ago, is now under investigation by the Securities and Exchange Commission after it failed to disclose important information and left a trail of misstatements behind.

Since Longfin's December initial public offering, which raised $5.7 million, the

company's price first rose 13-fold, then fell by 80%, all in less than four months. In the run-up to the IPO, the company, which says it operates computer platforms for trading on the Singapore and other stock exchanges, failed to disclose important information and misstated facts as basic as the age of its controlling shareholder, according to a review of securities filings.

On Monday, the company disclosed the SEC probe while also reporting material weaknesses in financial controls. The company, which said it is cooperating with the probe, said it may not be able to continue as a going concern.

The shares closed Monday down 17% at $14.31, above its IPO price of $5.  Longfin went public using a provision of the Jumpstart Our Business Startups Act of 2012, known as Reg A+.  The rules allow companies with less than $1 billion in annual sales to bypass some accounting and disclosure requirements imposed on bigger companies, but they do require accurate reporting.

The other nine Reg A+ IPOs that have listed on U.S. exchanges or been issued over the counter have lost more than half their value on average, Dealogic data show. Concerns about Longfin shine a light on the apparent ease with which IPOs are being approved under the Reg A+ regime, lawyers said.  "Everyone understood we were rationalizing the disclosures [required] but nothing as flimsy as what appears to have happened here," said James Cox, a law professor at Duke University.

"We're going to look back on Reg A+ and think this was an experiment that didn't get managed very well."

The SEC gave Longfin the green light to sell shares based on one month's audited financial statements, which showed that 96% of the company's expenses were paid to a company controlled by Longfin's owner, Venkat Meenavalli, an Indian entrepreneur. The company also provided two years of audited statements for a Singaporean subsidiary, which generates most of its revenue.  An SEC spokeswoman declined to comment.

Mr. Meenavalli, who says he controls 90% of Longfin shares, told *The Wall Street Journal* he is "based out of Dubai" but intends to spend 15 days a month in the U.S. He said its sole U.S. office space—a small room with three desks and no computers in a shared-office building in downtown Manhattan that was deserted at 9:30 on a recent weekday morning—is temporary. Longfin plans to open a bigger office in New York and is hiring more U.S. employees, he added.

Mr. Meenavalli rejects any suggestion of financial misconduct, saying short sellers, who have borrowed and sold short almost 15% of the shares available to trade, according to FactSet, are motivated by greed. "They enter into their own fire," he said.

A tiny portion of Longfin shares were sold in the Dec. 13 IPO. Two days later,

Longfin disclosed that its chief financial officer and chief operating officer had resigned just before the offering.  But on the same day, the company said it had acquired a crypto company, Ziddu.com, from a company controlled by Mr. Meenavalli.  Longfin shares rose more than 1,200% over the next two sessions to a peak value of $72.38.

Mr. Meenavalli is 48 years old, according to records he confirmed in an interview, although in a May 2017 SEC filing he is listed as 45. Described in that filing as "a financial wizard," his biographies for some earlier companies show him having a computer-science degree from Australia's Suffield University. His Longfin biography lists a diploma in international trade finance from Middlesex University in the U.K.

In SEC filings, Longfin reported it had 20 employees in March 2017. The number dropped to two the following month, rose to 15 in July, fell to three in November and was reported as 18 on Monday.  A filing in July 2017 listed Sarah Altahawi, 23, as a New York-based executive. Ms. Altahawi said Monday she is not a company officer, "so that was a mistake."

Her father, Andy Altahawi, said she was a secretary. He was issued 2 million Longfin shares for advising on its IPO, according to filings.  He said he "managed the SEC process as a consultant" and didn't act as a banker or underwriter.  Mr. Altahawi was listed on Longfin's website as a director until September, when the SEC questioned why he wasn't included in the company's filings.

"I'm not a director . . . never was—what was online was untrue," he said. Mr. Meenavalli said Mr. Altahawi was an officer for two months but then resigned and declined an invitation to join the board.

At its peak value, Longfin was included for eight trading days in the Russell 2000 small-company stock index, which would draw in some of the $122 billion in funds that follow the index.  Short-sellers said Russell made a mistake because just 1.5% of Longfin's shares traded, below the 5% minimum. Russell said it made the decision based on Longfin's IPO disclosures, which said more shares would trade.

Its reversal, announced March 26, sent the shares down 41% the next day. Mr. Meenavalli told the Journal Friday that the company now has a 7% free float thanks to the unlocking of some IPO shares. Mr. Meenavalli said Russell told him "they are going to include us back."

A spokesman for Russell said Longfin would be assessed like any other company during the next quarterly index update.  The spokesman also confirmed that the Journal's calculation, based on available information, that only 4% of the shares are available for trading "is accurate."

Mr. Meenavalli said Longfin "went through a stringent process of [approval by]

SEC and Nasdaq" and that its filings are being unfairly judged against the tougher standards set for bigger companies.

49.     On this news, Longfin's Class A Stock dropped from $14.31 pe share on April 2, 2018 to close at $9.89 per share on April 3, 2018, a decline of more than 30%.

50.     Thereafter, on April 6, 2018, the SEC unsealed a civil complaint involving the Company and announced that it had obtained a court order freezing more than $27 million in trading proceeds from allegedly illegal distributions and sales of restricted Longfin Class A Stock involving the Company, its CEO and three other affiliated individuals. This press release stated in relevant part:

> According to a complaint unsealed today in federal court in Manhattan, shortly after Longfin began trading on NASDAQ and announced the acquisition of a purported cryptocurrency business, its stock price rose dramatically and its market capitalization exceeded $3 billion. The SEC alleges that Amro Izzelden "Andy" Altahawi, Dorababu Penumarthi, and Suresh Tammineedi then illegally sold large blocks of their restricted Longfin shares to the public while the stock price was highly elevated. Through their sales, Altahawi, Penumarthi, and Tammineedi collectively reaped more than $27 million in profits.

> According to the SEC's complaint, Longfin's founding CEO and controlling shareholder, Venkata Meenavalli, caused the company to issue more than two million unregistered, restricted shares to Altahawi, who was the corporate secretary and a director of Longfin, and tens of thousands of restricted shares to two other affiliated individuals, Penumarthi and Tammineedi, who were allegedly acting as nominees for Meenavalli. The subsequent sales of those restricted shares violated federal securities laws that restrict trading in unregistered shares distributed to company affiliates.

> "We acted quickly to prevent more than $27 million in alleged illicit trading profits from being transferred out of the country," said Robert Cohen, Chief of the SEC Enforcement Division's Cyber Unit. "Preventing Defendants from transferring this money offshore will ensure that these funds remain available as the case continues."

> The SEC's complaint, which was filed under seal on April 4, charges Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi with violating Section 5 of the Securities Act of 1933. The complaint seeks injunctive relief, disgorgement of illgotten gains, and penalties, among other relief.

51.     On April 6, 2018, NASDAQ reported that trading of Longfin's Class A Stock had

been halted.  The press release stated in relevant part:

> The Nasdaq Stock Market® (Nasdaq: NDAQ) announced that trading was halted today in Longfin Corp. (Nasdaq: LFIN) at 10:01:38 Eastern Time for "additional information requested" from the company at a last sale price of $28.189. Trading will remain halted until Longfin Corp. has fully satisfied Nasdaq's request for additional information.

52.     The Company's shareholders had very little time to react to the announcement of the SEC action against the Company and NASDAQ's announcement halting LFIN's trading and, thus, many investors were unable to exit their positions prior to the halt.

53.     After the April 6 trading halt, there was no market for the Company's Class A Stock until May 24, 2018 – when the stock began trading on the OTC and was officially delisted from NASDAQ.

54.     When trading resumed on May 24, 2018, it opened at a price of $5.05 per share. By the time shareholders could sell their Class A Stock on the OTC, it had already declined over 96.46% in value.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

55.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, gross mismanagement and unjust enrichment by Defendants.

56.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

57.     Plaintiff is a current owner of Longfin stock.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

58.     During wrongful course of conduct at the Company, the Board consisted of the

Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

59.     The Longfin Board is currently comprised of eight (8) members – Defendants Meenavalli, Ratakonda, Patel, Dass, Gaddi, Nichols, Parker and non-party Karingam.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e*., four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

60.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

61.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

62.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

63.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders

or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

64.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

65.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

66.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## **THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED**

### **Defendant Meenavalli**

67.     Defendant Meenavalli is not disinterested or independent, and therefore, is incapable of considering demand because Meenavalli (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Longfin, making him not independent.  As such, Defendant Meenavalli cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.  Defendant Meenavalli is also a defendant in the securities

class action now pending entitled *Malik v. Longfin Corp., et al.*, Case 1:18-cv-04953 (S.D.N.Y.) ("Securities Class Action"). Moreover, Defendant Meenavalli owns 55.1% of all the outstanding shares of Longfin.

**Defendant Ratakonda**

68.     Defendant Ratakonda is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Ratakonda (as CFO) is an employee of the Company who derives substantially all of his income from his employment with Longfin, making him not independent. As such, Defendant Ratakonda cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood. Defendant Ratakonda is also a defendant in the Securities Class Action.

69.     Defendant Ratakonda is responsible for the false statements made in the Registration Statement and 2017 Form 10-K, both of which he signed.

**Defendant Gaddi**

70.     Defendant Gaddi not disinterested or independent, and therefore, is incapable of considering demand because Defendant Gaddi (as Chief Technical Officer) is an employee of the Company who derives substantially all of his income from his employment with Longfin, making him not independent. As such, Defendant Gaddi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

71.     Defendant Gaddi is responsible for the false statements made in the Registration Statement, which he signed.

**Defendant Patel**

72.     Defendant Patel not disinterested or independent, and therefore, is incapable of considering demand because Defendant Patel (as the Company's Global Head Officer) is an employee of the Company who derives substantially all of his income from his employment with Longfin, making him not independent.  As such, Defendant Patel cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

73.     Defendant Patel is responsible for the false statements made in the Registration Statement, which he signed.

**Defendant Dass**

74.     Defendant Dass has served as a Company director since August 2017 and is a member of the Audit Committee. As a member of the Audit Committee, Defendant Dass conducted little, if any, oversight regarding the statements above, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, Defendant Dass breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Nichols**

75.     Defendant Nichols has served as a Company director and is a member of the Audit Committee. As a member of the Audit Committee, Defendant Nichols conducted little, if any, oversight regarding the statements above, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, Defendant Nichols breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore,

excused.

**Defendant Parker**

76.     Defendant Parker has served as a Company director and is a member of the Audit Committee.  As a member of the Audit Committee, Defendant Parker conducted little, if any, oversight regarding the statements above, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, Defendant Parker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Additional Reasons**

77.     The Directors are beholden to Defendant Meenavalli, who faces a substantial likelihood of liability in the instant action, the Securities Class Action, and the SEC Action for his engagement in the misconduct discussed herein.  By virtue of his controlling ownership of Company stock and his position as CEO, Defendant Meenavalli controls the Company and dominates the Board.

## FIRST CAUSE OF ACTION

### (Against The Director Defendants for Breach of Fiduciary Duties)

78.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

79.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

80.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable

inquiry, and good faith.

81.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

82.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

83.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

84.     Plaintiff on behalf of Longfin has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against The Director Defendants for Unjust Enrichment)

85.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

86.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

87.     During the Relevant Period, Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

88.     Plaintiff, as a shareholder and representative of the Company, seeks restitution from

Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

89.     Plaintiff on behalf of Longfin has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### (Against The Director Defendants for Abuse of Control)

90.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

91.     The Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Longfin, for which they are legally responsible.

92.     As a direct and proximate result of the Director Defendants' abuse of control, Longfin has sustained significant damages.  As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Longfin has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

93.     Plaintiff on behalf of Longfin has no adequate remedy at law.

## FOURTH CASUE OF ACTION

### (Against The Director Defendants for Waste of Corporate Assets)

94.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

95.     As a further result of the foregoing, the Company has incurred significant legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company

and its products.

96.     As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

97.     Plaintiff on behalf of Longfin has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 28, 2018

**GAINEY McKENNA & EGLESTON**

By: _____

    Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: gegleston@gme-law.com
Email: tjmckenna@gme-law.com

*Attorneys for Plaintiff*
